All right, we'll call the next case of the morning. It's Luwisch v. American Marine Corporation, number 19-30499. Mr. Bland? Yes, ma'am. Will Bland on behalf of American Marine Corporation. Thank you for entertaining my arguments this morning. This is a Jones-Axe-Siemens case, a personal injury case, nothing particularly different about it. There's probably been thousands of them just like it. My client, actually before I get into my argument, but I'd like to say there's two threads that run through this entire case. Number one is plaintiff's credibility. Briefly, and it's in my brief, I'm sure you're aware, six weeks before he was hired, he'd been diagnosed with a herniated disc and another injury from another boat company. He didn't tell the company about it. He was hired. He falls off the second deck to the first deck in this accident that brings us all here today. Complains of the same injury, that is a herniated disc in his neck. Is sent to doctors by his attorney, three different doctors, and he doesn't tell them about his prior history of a herniated disc. He does not tell them that in fact after this accident he went back to work, and as we'll discuss a little later, for a year and a half prior to the trial, he had in fact been working as a chief engineer, which was his occupation at the time he was hired and the time he fell. At the time of the accident, the vessel was tied up mobile. It was a reduced crew. He was a senior officer with Mr. Lewitch and two deckhands, and all the facts in this case come from Mr. Lewitch's testimony and his admissions. There was no other crew member called. There were two deckhands on the boat who heard him when he fell and went to his assistance, but the facts as we know them come from Mr. Lewitch, and his admissions are very interesting. In any event, he's a senior officer. I asked him, well, as senior officer, if you saw a hazard or potential hazard on the vessel, was it in fact your responsibility to remedy or rectify the condition or report it to the port engineer who's 1,800 miles away in Los Angeles at the harbor there? He said, yes, that's my job. I was the top guy. I'm responsible. If I see something wrong, then it's my responsibility to fix it. In other words, he's eyes and ears, feet on the ground, however you want to say it, for the company. On the morning of the event, they have a safety meeting, Mr. Lewitch and his two deckhands. On the agenda that day was to move some rope or lines, as mariners call it, that were on pallets on the dock and stow them on board the vessel and ready for the next job. They have a safety meeting. They recognize that where the ropes are stored is actually on the second deck, and this rope could be 400 or 500 feet long. It's about three inches, two and a half inches in diameter. It's a towing line, and you're just not going to pick it up and move it. It takes some coordination. Lewitch told his two guys, I'm going to go up to the second deck, check it out, make sure it's satisfactory to where we want to stow the rope. He goes up there. Is it usual to store lines like that on the second deck? Yeah, even though this is a very powerful offshore tug, Your Honor, it's only about 85 or 90 feet in length, which by vessel standards is kind of small. And you don't have a lot of room on the main deck where the crew may have to work with the hawsers and the winches and all that. So they do store it up above, and they're not used in every job, but on long-distance towing they can be used and then deployed. He climbs up the ladder, the rung ladder welded to the bulkhead leading to the second deck. As his eyes reach the deck level, he sees that there's a rope already stowed there, another line about two and a half inches or so, two inches in diameter, stretched out, and part of the end where it loops around was in way of the entrance to the second deck. It has stanchions and a safety chain. When you climb up the ladder, you've got to undo the safety chain and then step up onto the deck. Lewitch testified that when I saw that rope, my eyes laid out on it, I knew it was a hazard, as he said, a big hazard. It was a tripping hazard. He gets up on the deck, secures the chain behind him, and then he says he spent five to ten minutes. We don't know exactly what it was, but he said five to ten minutes on the second deck looking around, checking it out, making sure they had enough room, what needed to be done. He then decides to return to go back down. So he walks back over to where he knew the rope was, where it was laying in way of the entrance. He undoes the safety chain, and then he looks over, and at the corner of the deck, maybe six, seven feet away, there was an electrical junction box secured to the deck, but it had been knocked over. He looked at that. He said to himself, I've got to get my tools and fix it. He keeps his tools in the engine room. He continues. He turns around, and as he does, he trips on the rope that he was either standing on or his foot was right next to it, and falls to the deck below. And here we are today. Now, there are several principles of the law that I wanted to talk about. The first one is the most obvious in maritime cases, and that is that the seaman has a duty to exercise reasonable care for his own safety.  So not only was it open and obvious, but he recognized that it was, in fact, a big hazard. He testified that there was no ---- And the district court found he was negligent. I mean, so is your quibble just with the percentage allocation? Yes, sir. And I have free arguments on that. But that's just such a discretionary decision when you've got negligence on both sides. So I think the district judge put it at 80-20. Yeah, maybe it could have been 50-50. Maybe it could have been 90-10. I mean, how ---- Well, I probably should have been 90-10. Okay. On the other side. On the other side, absolutely. Okay. There's a reason for that, Judge, because this is not a situation where you had conflicting testimony. But under a clear error, what case can you point to where we said, oh, the apportionment was off by 20-30, even more percentage? Well, for one instance, it's this, Judge. The district court, without giving an explanation ---- But you don't have ---- I'm just looking at an appellate case that said the apportionment ---- Yeah. The district court said both are at fault, and that apportionment, which is just, again, such a highly discretionary thing, is clear error. What cases have said that? Well, I can't point to a case that says that, but I think that the facts are so egregious, I mean so uncontested, that if the district court makes an error, that it's up to this court to remedy the situation. This is not a situation, Judge, where you have two or three people viewing an event, and you get two or three different versions, some wildly different, some similar, et cetera. This is ---- The facts are really not in dispute. Now, let me talk for a second about the judge said, oh, well, the primary duty rule has no application. In fact, it does. We have never claimed that that's a bar to recover. But in this case, Schoenbaum tells us that, look, and I'm going to just look at my notes if I may. The seaman must have consciously assumed a duty as a term of his employment. And he acknowledged that. He said, yeah, I was the guy on the boat who was charged with safety for the vessel. Number two, the condition complained of could have been eliminated by the seaman in the proper exercise of his employment duties. And three, the seaman knowingly violates that duty. He testified that they were in no rush that day. He had two able deckhands just feet away from him down on the second deck. He never called them. He never asked to stop work. Let me ask you a question about that because I didn't go into this in great detail, but it looked to me as if you didn't have much Fifth Circuit authority for this primary duty rule. Well, the Fifth Circuit has recognized it. I can't give you the case off the top of my head. As a contributory, it constitutes contributory negligence. That's all I'm saying. It doesn't, I mean. It's not a bar like the Second Circuit. No, not at all. So since the court did here find comparative fault, what's the difference? Well, I'm not following you, Judge. It found the plaintiff had engaged in negligence. Right. And that's what the primary duty rule would lead you to as well. So I guess I'm not sure what the primary duty rule matters. I mean, it seems to, going back to my earlier question, it's just a matter of how much fault should be apportioned to the plaintiff. If it's not an absolute bar, we're in this world of apportioning fault. Right. But if the apportionment is so outrageous, for lack of a better word. Yeah, no, I get that argument, but that's not about the primary duty. That's what I'm saying. It's just about apportioning the fault. Right. It's apportioning fault. And in this case, what is my client supposed to do? The port captain is 1,800 miles away in Los Angeles. The guy who's supposed to be taking care of making sure there are not ropes in the way of the entrance, which was open and obvious and he tripped over it anyway, he went back knowing that was there and tripped over it, so he's exposed himself to the danger twice. What is my client supposed to do when they're 1,800 miles away and the guy who's responsible for moving that rope decides not to move it? He doesn't ask for assistance. He doesn't ask to stop work. He does zero. And so what you're doing in that situation is imposing upon my client strict liability, and there's no such thing as strict liability in the maritime law. And there's another case, another line of cases. It leads me to this. While the courts have said, and I'll read again from my notes, the employer has a broad duty to provide a safe place to work. And I've cited these cases in my brief. The employer must have notice and opportunity to correct an unsafe condition before liability attaches. So my port captain is over in Los Angeles. He doesn't get notified by anything until after the accident happens, and then Mr. Lewitsch by that time has already run out and hired an attorney. What is my client supposed to do? Are we strictly liable if something goes wrong when the guy whose responsibility it was to take care of that problem blows it off, does nothing, and ends up getting hurt? I mean, it makes no sense, Judge. It makes no sense. That is placing a duty on my client, on any vessel owner, that is unreasonable. No boat owner who has no control of the vessel when it's underway, or in this case tied up in Mobile, Alabama, can do anything to prevent such an accident. So you would apply the same? You don't need to be in this line of business then. I mean, you know, if that's the situation, if that's how it works, and your answer is, well, he's in Los Angeles, how can he be responsible? Maybe he needs another line of work. Well, they're not saying they don't have responsibility. They hired a guy. Lewitsch had 30 years' experience as a chief engineer. He was an experienced seaman. And they had him on there for a reason. Let me ask you a question. Suppose there had been the classic slip and fall on the spilled coffee on the deck. Would you argue just as vehemently there? Well, Lewitsch was in charge, and the coffee was on the deck, and he had to clean it up before he could put it back. Well, I think if Lewitsch saw it, he recognized it was a hat, that that would be his duty. In this case, this is a little more serious. It was on the edge of the deck, eight feet above the deck. But we have cases where the cook slips in the coffee and gets recovery as a seaman, right? Well, I don't know. I think there are cases where the cook slips on coffee and doesn't get a recovery. I think it depends on the facts. I mean, if the cook had poured the coffee, had dropped the coffee there, and he or she knew it and did nothing about it and continued to walk around the galley for the next hour and a half, shame on them. That's a breach of the duty of reasonable care, and it's probably a breach of the primary duty rule also. There's another reason that this 2080 apportionment of fault is so lopsided. When Lewitsch was hired, he concealed from the court, excuse me, from his employer, the fact that he had a herniated disc in his neck. He then deliberately went back to work, exposed himself, as they say, to the perils of the sea, ends up falling, complains about an injury to the same part of his body. When he knew that working as a chief engineer on a vessel is a hazardous occupation, he can't claim that he didn't know he had a herniated disc because the record is well established that he did know he had a herniated disc. But he hid it, and as a result, he claims he re-injured it. But there's no evidence that his neck was any worse after this accident than it was before his accident. Did he tell the truth to anybody except when he was on the stand explaining how the accident occurred? Well, I don't think he told the whole truth when he was on the stand. He tried to make up a... Well, I mean, that's except for explaining how the accident occurred. I mean, he didn't tell the truth to his doctors. He didn't tell the truth to his lawyer. He didn't tell the truth to his employers. He didn't tell the truth to the voc rehab expert that was hired by his attorney. He hid from him the fact that he had been back to work. Yeah, he lied at every opportunity that he could to advance his case. There's no doubt about it. And I don't want to... Well, I could spend the rest of my argument talking about the number of lies he's made, but if there's any credibility given to him, then that's sadly mistaken. I would like to move to the lost income question unless you have any other questions. The guiding principle here is to recover an award for loss of future income. Again, I'm reading from my notes. I'm going to give you... Your red light just came on. I will give you one minute, okay? All right. Thank you, Judge. The plaintiff must present evidence that shows reasonable certainty that a residual disability related to his accident occurs, which prevents him from earning the same as he was earning to the extent prior to his accident. No doctor testified he has any disability. Both voc rehab folks testified that there was no evidence of any medical disability. Both the experts testified that when Mr. Lewits retired, and that's a whole separate issue, he gave up any expectation of income stream. The fact that two or three months before he retired, he was talking to his boss at Kim Susan Inc. He told him, I'm thinking about quitting. I want to retire. I want to go home. I want to get away from the sea. He took the concrete step of incorporating a business where he was called H&H Seafoods, where he was going to sell seafood. We introduced testimony where he was Facebooking with his friends, talking about his career is going well. So you have the retirement. You have the fact that... And the biggest test of all, he went back to work for a year and a half, working as a chief engineer with no disability, et cetera. Yes, sir. You have time for rebuttal. Thank you, ma'am. Okay. Good morning, Your Honors. May it please the Court, my name is Christy Post. You want to speak up, please? Yes, Your Honor. Good morning. My name is Christy Post. May it please the Court, I'm here to represent Mr. Henry Lewis. I agree, first of all, with Judge Costa's remarks, that the apportionment is highly discretionary and that the findings of the trial court, all of her findings of fact of the district court judge, have to be looked at and considered and that the burden of proof in showing that they're clearly erroneous is a very great burden and it's heavier in this case because it turns on the credibility of several witnesses, including... He may be, Your Honor, but the district court found that he was credible in his testimony before her. He did, to his credit, own up to the concealment and to the statements that he made to his doctors and so forth, and I don't condone that in any respect. Nevertheless, in front of the district court, she found that his testimony to him was credible because he did admit to all of these things to her. The primary duty rule, I don't believe, is applicable in this instance. The judge assessed 20% comparative fault to Mr. Lewis in this case. She found that when he went up onto the top deck to go and assess where to place the new rope that was on the dock, that he discovered that there was rope already there and that rope was covered with numerous heavy boards that were too heavy for him to lift. When he was inspecting this, and by the way, those items were placed there before he ever worked on the vessel, so they were longstanding. This was not an incidence of some sort of transitory unseaworthiness. So the district court found, number one, that the vessel was unseaworthy for the placement of these ropes and boards that blocked the walkway for all of the crew members, not just Mr. Lewis, but it was unseaworthy as a matter of law. She also found that it was negligent and that they did not provide a safe place to work for Mr. Lewis because of that. Now, when Mr. Lewis went up to this top deck to assess where to put the rope that was located on the dock, he noticed this, and in doing so, he saw an electrical junction box that was on the side of these ropes and boards that had wires sticking out of it. And he did not know, as the engineer on the vessel, whether those wires were live wires. They could. They could pose a tremendous threat to himself, to the other crew members, and to the vessel itself. Well, doesn't that heighten, not diminish, the primary duty? No, it does not, because he actually used his stop-work authority, as the district court found, and he was fulfilling his primary duty in doing that, as the district court found. What do you mean, stop work? In other words, he didn't call on the fellow downstairs. He stopped to handle it himself. Is that what you're talking about? He did, Your Honor, and the district court found that it would have been dangerous, in fact, for him to call other crew members up there without determining whether or not this electrical junction box was live, as they say, meaning it had electricity, because it could have posed an electrocution threat. So what he did was assess what tools did he need to go and check the electrical junction box, and he was proceeding to go down the ladder when he tripped and fell. So this was a very serious injury. He went head first. Well, actually, it was less serious than it could have been, I must say. I mean, he said his shoulder hurt, he had some bruises. I mean, the guy was really blessed. He actually fractured his clavicle in the fall, was rendered unconscious, and he further injured his neck. So I wanted to talk a little bit, when we get on that, they brought up the concealment as another issue. The McCorpin issue was already decided by the district court, but I understand that pursuant to Johnson v. Sennac, they're asking this court to look at that concealment to somehow perhaps add additional comparative fault. And I think Judge Costa was asking, well, what cases do you have to support going beyond the discretionary function of the district court in assessing apportionment? And I think what they're trying to do is look at Johnson v. Sennac to say that, well, we need to add some additional comparative fault. And I don't believe that Johnson v. Sennac or Gavigan or Savoie or any of those cases support doing that. Those cases all looked at whether or not a McCorpin concealment can then be used to say that this person placed themselves in a position to become injured. But I do think, and, Your Honor, Judge Jones, that was your opinion. I believe that the difference is in Johnson v. Sennac, the trial court had found 100% fault on the employer, whereas the findings of fact showed that the employee also had some fault. So it was remanded to consider whether or not there should be comparative fault on the employee for that purpose. But in this case, I think it's discretionary for two. Well, I looked at the record here because the defense definitely asserted the primary duty argument on the Jones Act claim in the district court. But I didn't see where it asserted the McCorpin issue about lying, and if he didn't have the job, he wouldn't have, you know, Was that argued below the McCorpin? I know it was argued as a bar to maintenance and cure, but was it argued in the Jones Act context? It really was not. Or unseaworthiness. It really was not. It's brought up sort of as a peripheral matter in the appeal, and that's why I wanted to just address it because it really does not square with your case. Well, you're wasting your time. Move on. Okay, I'll move on. The medical evidence. They talked about my client lying and that he was already injured. They're beginning to talk about that. Well, he rolled over an ATV, didn't he? Actually, it was a very – evidence in the record showed that he was a very slow accident. He swerved to avoid a turtle on a road and rolled it over. I knew you were going to pull that out. He injured his head. Saving the turtle, Your Honor. But he actually had a head injury as a result of that, and there was no evidence that he had any type of radiculopathy or anything of that nature. He did have severe injuries. What evidence was there of radiculopathy after this incident? There was evidence. The only evidence of it. For which he took Tylenol, right? No, ma'am. He was taking – initially he was taking a lot of very serious medication. When he decided that he needed to go back to work because of the financial pressures he was facing, he knew that he could not pass a Coast Guard physical if he were taking the prescribed pain medication, so he took himself off of that and took Advil instead. Okay. So he had been prescribed that. He had had a great deal of medical treatment, but he knew from his experience that the Coast Guard will not permit certain medications for a seaman who's out working on a vessel. So he took himself off of that for that very reason. So he controlled the pain with Advil? Well, to the extent that he could, there was also testimony in the record that when he was not at work, he drank alcohol and took other over-the-counter medication, and that he took so much Advil it was making him sick because it's bad for your stomach. Why are we supposed to believe that when he doesn't tell any of the doctors his relevant medical history and the doctors are even confused about the aggravation issue? Frankly, that was a disputed fact issue. Well, I don't believe that the aggravation is terribly disputed. Dr. Alden, his first physician, found all kinds of different findings of exacerbation. Dr. Bokodre and Dr. Bartholomew both actually compared the 2011 and the 2015 MRI films themselves, and that was not disputed really by anyone. They both compared them and said that the findings on the second film, which was taken shortly after this accident, were worse, and they could point out the actual parts where they were worse, and that he didn't have radiculopathy before that accident, which is the primary problem that he had and why the surgery was recommended. So I don't believe that that was the case, that there was no finding. He never had surgery, though, right? No, ma'am. It was not paid for. That was one of the disputed issues under the McCorpin defense. It was initially approved and set up, and he flew to New Orleans to have the surgery, and they would not pay for it, and it had to be canceled at the last minute. So then he went back to work offshore for somebody else? Yes, ma'am, he did. He did go back to work offshore. We're not disputing that. But in this case, though, the appellant would have this court impose on my client, basically, a duty to go forth in the future and not be honest with future employers, which was their main complaint in here that they wanted McCorpin on. I mean, let's think about it, I mean, just for the sake of argument, because this client really is. I realize the court discounted some of his claim damages, but my goodness, suppose he had actually stayed off work following this accident and insisted on having surgery and then been off work for an entire year. The company would have been on the hook for that, would it not? Well, he did stay off work for a period of time. I know, about six weeks, if I'm not mistaken. Well, on and off, and then he was not working offshore initially for a good deal of that time. He was initially working onshore. I'm still asking you the question, though. If he had fessed up to the ñ well, not ñ if he had taken the cure that he claims he was entitled to because of this injury and the severe pain and so on, the company would have been liable for it, right? Yes, they still were liable, and the district court found them liable to pay for that surgery. Well, they did after the ñ yes, several years later after litigation. But what I'm saying is he didn't think he was that sick, so he went back to work. But the company would have been responsible for the entire period that he was off work. Responsible in what ñ in terms of maintenance and cure? Yes. Well, they paid ñ they ended up paying the maintenance after the fact and brought that up to date, but it was the surgery that was not paid for. As I said, it was initially approved, and he flew in, and then it was not approved, not because of their claiming concealment. They didn't approve it because they were claiming it had to go through an audit process. So they did authorize that and then subsequently refused to pay for it. And at that point, yes, he did go back working offshore. But, again, a lot of these things were, you know, as distasteful as they may seem in some respects. It doesn't take away the fact the district court took away the McCorpin ñ gave the McCorpin defense and took away the maintenance and cure based upon that. So whatever punishment the district court felt Mr. Lewis deserved for this was already assessed by taking out the maintenance and cure and by the assessment of the 20 percent comparative fault. For the appellate to argue that he should be assessed greater fault, I just don't see anything persuasive for them to base that upon because of the discretionary function of the trial court judge. She was the only person that had the unique ability to assess the credibility of everyone. And from the looks of the opinion and the findings of fact and conclusions of law of the district court judge, she was impressed in some respects by Mr. Lewis being forthright with her. Were you the trial counsel? Yes, ma'am, I was, Your Honor. So the concealment is the other issue. And as I said, that was something that was already addressed by the district court. So I just don't see any basis to disturb the district court's findings of fact with respect to the apportionment of fault. They had some other issues in their brief that Mr. Bland didn't quite get to about the income saying that my client was retired. That was a comment that he made to his last employer at Kim Susan, and that was something that was testified to at trial, but it was inside of a document that really was not signed by the client. Well, how can there be any dispute about that? Because he went and he wanted to set up a seafood truck in Georgia. Well, but he was actually buying and selling shrimp on the side of the road out of his trunk. Right. And then he found out right after that that the state of Georgia does not allow you to do that. Well, it doesn't. I mean, it doesn't matter, but he clearly retired. Well, he didn't retire. He told them that he was no longer able to. He told them that he was retiring was the testimony from the Kim Susan gentleman. Mr. Lewis did not say he retired. The gentleman from Kim Susan was based at. Well, actions speak louder than words, don't they? Pardon? Actions speak louder than words. He was 56 when he decided to not be on the sea anymore? Yes, Your Honor, and he didn't decide that. The vessel with the Kim Susan was in a shipyard, and Mr. Lewis' testimony, which the district court found persuasive, was that he was not able to continue doing that work because once they got into the shipyard, he didn't have an oiler assistant to do all of the moving buckets and heavy things, and he knew he wouldn't be able to do the work, and he was starting to have more and more symptoms. He was having left arm numbness and pain. He was having difficulty carrying things. He was having difficulty going up ladders, and he thought it was in his best interest to stop. How can we believe any of that? Well, the district court believed it, and there was nothing that was offered to oppose that testimony in any way, to controvert it. The only thing that was relied upon by the Kim Susan on that was a form that was filled out by the company, a notice of separation, and the company signed it, but the portion where the employee is supposed to sign it was blank. Mr. Lewis never signed that. Someone else with the company signed it and said that that was his reason for leaving was retirement. Well, there's nothing not credible about that, right? Well, I mean, he didn't sign it, and that was the point. So the district court found that he had not fully, quote, retired, but that he stopped working because his symptoms, because of not being treated and not having surgery, continued to be exacerbated and get worse and worse and worse. And that's borne out in the medical testimony. If you look through Dr. Bocadre and Dr. Bartholomew's testimony, they said this is not something that's going to just spontaneously improve on its own. If anything, it's something that is going to cause a decline in the person, and that's what was happening, and Mr. Lewis realized it and at that point said he did not feel that it was safe for himself or the other crew members for him to continue working as a chief engineer on offshore vessels. So at that point, he did remove himself from that type of employment. He did not relent and say that I, in fact, retired, but he said I removed myself from that type of employment because I was in a situation where I didn't have an assistant anymore and my symptoms were getting worse and worse from trying to do this work myself, and going up a ladder, which he has to do all the time as a chief engineer, climbing up a ladder when your arm has gone numb is a hazardous thing to do. So he elected to take himself out of that employment sector. He does still work, and the district court discounted for his future wages for his ability to do other employment. So he's retired, or not retired, but removed himself from doing offshore work, but he is still working. He's always worked before and after this incident. He's got an excellent work history, actually, and very good wage earnings by the records in this case can show. Does the court have any additional questions on any of the? I don't think so. Thank you, then I'll give up the rest of my time. Thank you very much. Judge, I've heard counsel say, well, he didn't have surgery, the company was going to pay for it. Let me tell you what happened. Two weeks before trial, I took Dr. Bartholomew's deposition. He was going to Italy. No, he was going to Russia someplace. So we go to take the deposition. By the time I got finished with his deposition, after he was shown Lewitt's true medical history, he said, I've changed my mind. He doesn't need me. If he's getting by with Advil, he doesn't need neck surgery. It wasn't because nobody paid for it. It's a good thing we didn't pay for it two or three years before the trial. Because once Bartholomew knew the truth, he said, no way, I'm not going to operate on this guy. Dr. Alden, who counsel mentioned, said, I haven't seen this guy, testified at trial, I haven't seen this guy for three years. I don't know what his prognosis is. And then he was asked, well, if somebody with these kind of issues has an injury like that, is he going to get worse? Yeah, probably so. But he doesn't know anything about Lewitt. He took three U.S. Coast Guard physicals designed to test for capabilities of an individual to work as a chief engineer. One for blackwater diving, two for Kim Susan. This is in the year and a half before trial. He passed all three. He was found to have the strength and agility to do the job. Dr. Bartholomew testified, he compared the MRIs. And I said, doc, look at this. Isn't this preexisting injury also evidence of prior existing degenerative changes? He said, yes. I said, well, doctor, can you tell if the changes shown on the MRI are consistent with continued degeneration? Because degeneration doesn't stop. We all go through it. We all have it. It's not going to get better. It's going to get worse. He said, no, I can't tell. It may have been made a little worse, the findings on the MRI a little worse by the accident. But it could be the progressive disease that he had in his neck. And then a trial oppressed him. Because it didn't make any sense to me why an engineer with 30 years' experience, knowing that that rope is there, knowing that it is a safety hazard, would walk back over to it and not have done anything to get rid of it to fix the problem. And at that point, Lewitsch blurts out, I'm not going to sit up there and wait for somebody to come around while we can go down and say we got a problem. He went down the ladder because he was impatient. He never called stop work. He goes to the ladder. He's going down. He looks over the junction box. He turns around to go. There's no hesitation. And the next thing you know, he falls off the top deck onto a big metal locker, bounces off of that onto the deck below. He's lucky he didn't break his neck. There is no evidence to support a fine of 80% liability on my client, Your Honor. It's got to be no less than 90-10. And I think that is why the district court did this. I have no idea. I have no idea. But clearly the claim for future lost income, lost benefits, et cetera, doesn't fly. There is no evidence by any doctors, not even his voc rehab expert was going to get on board with the idea that he has a disability. He said, and the district court even noted it, he said, my job is to assume he has a disability limiting him to light to medium work. Well, you wouldn't disagree, would you, that if he did have a degenerative neck disc change that most offshore employers would not hire him? No, I think that's incorrect, Judge. There's so many folks out there in the industry, for a variety of reasons, who have degenerative changes in their neck. But they take Advil, they take Motrin, that sort of thing. But this guy had more than degenerative. Six weeks before the accident, he had a frank herniated disc that he didn't have before. All right. So that's my point, that he wouldn't have gotten these jobs without misrepresenting his neck. Oh, I agree. I agree. He lied to get the other jobs. But the fact is, he was able to take a physical and pass it. I mean, that is objective proof of nothing else is. And the other objective proof is that he did a good job. Kim Susan's HR manager said he did a good job. He was sorry to see him go. Lewitsch acted like he was sorry to go. But he wanted to do other things, and he did. And that, to me, is a bright line. Once he retired, his expectation of an income stream as a chief engineer ceased. Just like if I ever get a chance to retire, my income stream as an attorney is going to cease. I doubt that will happen, or I'll probably die at my desk. But, I mean, that's a fact of life that we all deal with. And the fact that he went back to work is, well, it's consistent with everything else this guy has done. Okay. Thank you, Judge. Yep, we have your argument. We have the briefs. Thank you very much.